UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


CHRISTINE FUMICH,               )        Case No.  5:14CV2307
                                )
                    Plaintiff,  )        JUDGE JAMES S. GWIN
                                )
        v.                      )        Magistrate Judge George J. Limbert
                                )
CAROLYN W. COLVIN,              )
ACTING COMMISSIONER OF          )        REPORT AND RECOMMENDATION
SOCIAL SECURITY,                )        OF MAGISTRATE JUDGE
                                )
                    Defendant.  )


Plaintiff Christine Fumich ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1.  Plaintiff asserts that the Administrative Law Judge ("ALJ") erred in analyzing her intellectual functioning under Listing 12.05C of 20 C.F.R. Part 404, Subpart P, Appendix 1("the Listings") and erred in analyzing the opinion evidence of Drs. Sampsel and Smith.  ECF Dkt. #1; ECF Dkt. #13.

For the following reasons, the undersigned recommends that the  Court find that the ALJ applied the proper legal standards and substantial evidence supports his determinations that Plaintiff's mental impairment did not meet Listing 12.05C and in giving little weight to the opinions of Drs. Sampsel and Smith.

**I.      PROCEDURAL HISTORY**

Plaintiff applied for DIB and SSI on May 13, 2011, alleging disability beginning October 16,

1

2009 due to cerebral palsy, bipolar disorder, and a learning disability. ECF Dkt. #12 ("Tr.") at 143-144, 184-193, 248-259. The Social Security Administration ("SSA") denied Plaintiff's applications on initial determination and upon reconsideration. *Id.* at 143-159. Plaintiff requested a hearing before an ALJ. *Id.* at 160.

On April 22, 2013, the ALJ held a hearing where Plaintiff, represented by counsel, and a vocational expert ("VE") testified. Tr. at 47-49. On May 13, 2013, the ALJ found that Plaintiff had the severe impairments of bipolar disorder, learning disability, lumbar and thoracic degenerative disc disease ("DDD"), knee tendonitis and obesity. *Id.* at 32. However, he found that these impairments, individually or in combination, did not meet or equal the Listing of Impairments in 20 C.F.R. Part 4, Subpart P, Appendix 1. *Id.* at 333-335. The ALJ further found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that she needed a sit/stand option to shift positions as needed every couple of hours, she should have no reading or math requirements for a job, the work should not be complex, involve arbitration, mediation or negotiation, and she was limited to simple, repetitive tasks and low stress work with no high production quotas, minimal interaction with the public, co-workers and supervisors, and no work as a telephone solicitor. *Id.* at 35-38. The ALJ further found based upon this RFC and the testimony of the VE, that Plaintiff was unable to perform her past relevant employment, but she could perform a significant number of jobs existing in the national economy, including the representative occupations of mail clerk, laundry worker and cleaner. *Id.* at 38-39. He concluded that Plaintiff was not under a disability from October 16, 2009 through the date of his decision and was therefore not entitled to DIB or SSI. *Id.* at 39.

Plaintiff requested that the Appeals Council review the ALJ's decision and the Appeals Council denied the request, finding no basis for reviewing the decision. Tr. at 1-24. Plaintiff filed

an appeal to this Court and Defendant answered.  ECF Dkt. #1, 11.  At issue is the decision of the ALJ dated May 13, 2013, which stands as the final decision.  Tr. at 30-40.

## II.    SUMMARY OF MEDICAL EVIDENCE

### A.    PHYSICAL IMPAIRMENTS

On August 4, 2009, Dr. Ghoubrial performed a physical evaluation for the agency.  Tr. at 382. Plaintiff informed Dr. Ghoubrial that she was not able to work because of "a slight case of cerebral palsy."  *Id*.  She explained that if she stood for long periods of time, such as more than three hours, she felt pain in her left Achilles tendon and in her back.  *Id*.  Her past medical history included mild cerebral palsy, learning disability, impulsive control disorder, bipolar disorder, hyperlipidemia, anxiety, and depression.  *Id*.  Dr. Ghoubrial noted that Plaintiff was 5 feet tall and weighed 165.4 pounds.  *Id.* at 383.  Upon physical examination, he found that Plaintiff had a slight lisp, no cervical problems, a normal cardiovascular exam, no lung, abdomen or grasp/manipulation problems, a negative Romberg test and straight leg raising, no muscle spasms or atrophy, and normal ranges of motion in her cervical spine, upper extremities, and in her dorsolumbar spine, hips, knees and ankles. *Id.* at 379-385.  Dr. Ghoubrial's impression was that Plaintiff would have no difficulty sitting, standing, seeing, hearing, speaking or traveling.  *Id*. at 385.

On November 23, 2009, Plaintiff presented to Dr. Case at Wooster Orthopaedics & Sports Medicine for left knee pain that she had since falling down stairs in high school.  Tr. at 569.  Physical examination revealed diffuse tenderness over the left knee worst at the medial and lateral patellar facets.  *Id*.  She had no effusion, normal stability and full range of motion.  *Id*.  X-rays showed normal results and Dr. Case diagnosed left knee pain patellofemoral in nature.  *Id*.  He recommended physical therapy for quadriceps strengthening, the avoidance of knee activities and stair climbing and he gave her a cortisone injection.  *Id.*

-3-

On February 16, 2010, Plaintiff presented to the emergency room complaining of abdominal pain over the last two days and related her past medical history of hypertension, endometriosis, and ovarian cyst for which she was on birth control to help but recently stopped because of insurance reasons. Tr. at 388. Abdomen and pelvis CTs were normal and she was diagnosed with abdominal pain, given prescriptions and advised to follow up with a health clinic to get back on birth control pills. *Id.* at 388-405.

On January 20, 2011, Dr. Demund, ordered physical therapy for Plaintiff's back pain in pregnancy diagnosis. Tr. at 493-498. She attended seven sessions before being admitted to the hospital on March 23, 2011 for chronic hypertension in pregnancy. *Id.* at 461, 493-499. Her history of hypertension and severe preeclampsia with her first child was noted, as well as a history of gestational diabetes and a stress test showing 20% blockage in her coronary arteries for which she was placed on bed rest and observation. *Id.* Her high risk sexual behaviors were also noted as she developed primary herpes and HPV infection during her pregnancy. *Id.* She was discharged on April 15, 2011 after her C-section and requested tubal ligation. *Id.* Her final diagnoses were intrauterine pregnancy at 36+weeks, chronic hypertension with superimposed preeclampsia, gestational diabetes, late preterm delivery, failed induction and primary C-section with tubal ligation. *Id.* at 462.

On April 20, 2011, Plaintiff underwent imaging for the swelling of her left calf and foot eight days post-partum and no evidence of left lower extremity deep vein thrombosis was found. Tr. at 491.

On September 21, 2011, Plaintiff presented to Wadsworth-Rittman Hospital for right shoulder and knee pain. Tr. at 591. She had excellent range of motion of the bilateral shoulder, hip, wrist, knee and ankle, no effusions, equal pulses but some tenderness over the patella tendon on the right and pain with range of motion with the right shoulder. *Id.* at 592. The doctor's impressions were acute right shoulder and right knee tendinitis. *Id.*

-4-

On September 23, 2011, Plaintiff presented to Dr. Gesler of Wooster Orthopaedics & Sports Medicine for evaluation of polyarthragias.  Tr. at 570.  He noted Dr. Case's past treatment with Plaintiff and her lack of follow-up after the cortisone injection of her knee.  *Id*.  Dr. Gesler indicated that Plaintiff presented to the emergency room a week prior to seeing him due to pain in her right knee, right shoulder and right ankle.  *Id*.  The emergency room did not take x-rays, indicated that she had tendinitis, and gave her Vicodin and Flexeril.  *Id*.  Plaintiff requested an injection for her left knee as she said her right knee only bothered her for a week and a half.  *Id*.

Upon examination, Dr. Gesler found that Plaintiff had good range of movement in her shoulders, elbows, wrists and hips, with full extension of her knees, no effusion and good pulses.  Tr. at 570.  He noted that Plaintiff had mild tenderness along the medial joint line of her right knee, moderate tenderness at the inferior pole of the patella bilaterally and mild hyperextensibility.  *Id*.  Dr. Gesler diagnosed patellar tendinitis with no evidence of internal derangement and prescribed Lodine and physical therapy.  *Id*.

On October 31, 2011, Plaintiff presented to Wadsworth-Rittman Hospital for left knee pain.  Tr. at 588.  She had full range of motion in the left lower extremity, with no effusion or erythema, but tenderness of the left knee.  *Id*.  X-rays showed no fracture and Dr. Smith diagnosed acute left knee pain and possible loose body and/or internal derangement of the left knee.  *Id*. at 588-590.

On December 7, 2011, Plaintiff followed up with Dr. Petrilla for chest pain for which she went to the emergency room on December 5, 2011.  Tr. at 574.  He diagnosed flare-up of GERD and prescribed medication.  *Id*.

On December 28, 2011, Plaintiff presented to Wadsworth-Rittman Hospital for back pain.  Tr. at 585.  X-rays showed mild dextroconvex scoliosis of 8 degrees, showing slight increasing severity since December 5, 2009.  *Id*.  A mild compression fracture of T5 was not changed since 2009 and

-5-

mild DDD was noted throughout the thoracic spine. *Id.* Lumbar spine x-rays showed moderate levoconvex scoliosis and mild facet arthropathy at the lumbosacral junction. *Id.* at 586. X-rays of the sacrum and coccyx showed mild lumbosacral facet arthropathy. *Id.* at 587.

On March 21, 2012, Dr. Petrilla completed a medical source statement regarding Plaintiff's ability to physically perform work-related activities. Tr. at 602. He opined that Plaintiff could lift less than ten pounds occasionally and frequently, she could walk/stand and sit less than two hours per eight-hour workday, she needed a sit/stand option every fifteen minutes and had to walk around every five minutes for a total of five minutes each time. *Id.* at 601-602. As the medical findings supporting his opinion, Dr. Petrilla identified lumbosacral and thoracic spine DDD, mild scoliosis, and knee tendinitis. *Id.* at 603. He further opined that Plaintiff could occasionally twist, crouch and climb stairs, but she could never stoop or climb ladders. *Id.* He noted that Plaintiff's reaching, handling, fingering and feeling were not impacted by her impairments, but pushing/pulling were. *Id.* As support, he identified Plaintiff's low and mid back pain and referred to her x-rays showing DDD. *Id.* at 604. He also opined that Plaintiff had no restrictions on extreme cold or exposure to irritants, but she had to avoid even moderate exposure to extreme heat and high humidity. *Id.* Dr. Petrilla further noted that he was first concerned about Plaintiff's bipolar depression, learning disability and poor cognitive skills and the fact that she could not drive due to her failure to pass the license test. *Id.* He opined that she would be absent from work more than four days per month due to her impairments. *Id.*

On May 2, 2012, Plaintiff underwent a chest x-ray for diaphoresis and the results were normal. Tr. at 648. On June 20, 2012, Plaintiff had a chest x-ray for diaphoresis and chest pressure and the results showed congenital vascular variations and an echocardiogram was recommended. *Id.* at 709.

-6-

On July 10, 2012, Plaintiff underwent a echocardiogram which showed normal results. *Id.* at 708.

On July 25, 2012, Plaintiff underwent an overnight polysomnogram for obstructive sleep apnea CPAP adjustment. Tr. at 704. Adjustments were made. *Id*.

On January 17, 2013, Plaintiff presented to the emergency room for right knee pain. Tr. at 701. She related her history of tendonitis and reported that she was on the floor and when she went to get up, she buckled and was having trouble standing and using the stairs with her right knee. *Id*. X-rays of the right knee were normal. *Id*. at 703. Based upon physical examination, Plaintiff was diagnosed with patellar tendonitis and given a pain shot and medication to take home. *Id*. at 701.

On January 25, 2013, Plaintiff underwent a esophagogastroduodenoscopy with biopsy, a CLO test and small bowel biopsy due to her anemia and complaints of chest pain and reflux. Tr. at 698. Distal ulcerative reflux esophagitis and gastroduodenitis were assessed. *Id.*

On February 1, 2013, Plaintiff underwent a total colonoscopy with biopsy for her anemia and abdominal pain. Tr. at 696. Probable irritable bowel syndrome was assessed. *Id.*

On February 11, 2013, Plaintiff underwent a small bowel study based upon anemia and weight gain. Tr. at 694. The results were normal. *Id.*

On March 8, 2013, Plaintiff presented to the emergency room for right knee pain. Tr. at 690. She indicated that the pain came on gradually while she was at work and standing for a period of time. *Id.* Examination showed that the right knee was tender, particularly in the patellar tendon and in the region of the quadriceps tendon. *Id*. Patellar tendonitis was diagnosed and Plaintiff was placed in a knee immobilizer, given an injection in the knee and prescribed Vicodin. *Id.*

On April 4, 2013, Dr. Petrilla ordered a knee x-ray of Plaintiff's left knee which showed normal results. Tr. at 716.

On June 13, 2012, Dr. Petrilla performed a basic medical examination for a disability evaluation for Plaintiff. Tr. at 646.  He noted her diagnoses of hypertension, major depression, gestational diabetes, scoliosis, DDD of the lumbar and lumbosacral areas, obesity and sleep apnea. *Id.*  He further noted that Plaintiff indicated that her principal disabling condition was her mental status of bipolar disorder, depression and mild mental retardation.  *Id.*  Upon examination, Dr. Petrilla indicated that Plaintiff had no neck masses, regular heart sounds, clear lungs, normal abdomen but for obesity, mild scoliosis and diminished range of motion of the upper back and the back, and normal neck exam.  *Id.*

On July 16, 2012, Plaintiff presented to Dr. Petrilla for follow up on tests that he had ordered for her.  Tr. at 642.  He assessed obstructive sleep apnea, pulmonary artery hypertension and ventricular septal defect and aortic arch hypoplasia.  *Id*.  He ordered her a CPAP and referred her for a cardiology consultation to determine whether she needed a transesophageal echo.  *Id*.

On August 2, 2012, Plaintiff underwent a hearing test which showed mixed hearing loss, particularly with soft speech sounds and difficulty hearing/understanding in noise and at distances. Tr. at 724.  Hearing aids were recommended.  *Id*.  Plaintiff's history of surgeries in both ears was noted.  *Id*. at 727.  Plaintiff received hearing aids.  *Id*. at 727-733.

On December 3, 2012, Plaintiff presented to Dr. Petrilla to discuss her iron deficiency, GERD, and anemia.  Tr. at 670-672.

## B.     MENTAL/PSYCHOLOGICAL IMPAIRMENTS

A psychological report from Cuyahoga Falls School dated November 10, 1986 when Plaintiff was eleven years, eight months old, shows that her mother explained that Plaintiff suffered from mild cerebral palsy which affected the lower half of her body and she had a history of hearing difficulties

-8-

with a 45% hearing loss in her right ear. Tr. at 301. Plaintiff was taking Ritalin. *Id.* The Weschler Intelligence Scale for Children-R ("WISC-R") indicated that Plaintiff had a prior verbal IQ score of 68, 77 for performance IQ and 71 for full-scale IQ, and current WISC-R testing showed that Plaintiff had a verbal IQ score of 82, a performance IQ of 74, and a full-scale IQ of 77. *Id.* at 302. Testing for Plaintiff's mental age indicated a mental age of 9 years and one month. *Id.* The school psychologist concluded that Plaintiff's intellectual abilities fell within the developmentally handicapped/low average range. *Id.* at 304. He noted that she had made great academic progress over the past several years, but her overall reading, math and writing skills were in the below average range. *Id.* He recommended that Plaintiff continue in special education services as her mother and teacher believed that Plaintiff would not continue to progress without them. *Id.*

A school case summery dated December 5, 1989 indicated that Plaintiff was functioning in the borderline below average range of cognitive ability based upon the WISC-R. Tr. at 305. The school psychologist noted that the result may be a low estimate of Plaintiff's ability as a previous IQ measure on another test indicated low average ability with an IQ of 87. *Id.* She was continued in the specific learning disabilities although it was noted that she could have been eligible for the developmentally handicapped program but her mother refused placement in that program. *Id.* at 306.

On June 10, 1994, Plaintiff's doctor, Dr. Burdette, noted that she was seen for her attention deficit disorder and she was taking Ritalin and having a favorable response. Tr. at 37. On January 16, 1995, Dr. Burdette noted that Plaintiff was no longer on medication and he saw no need for her to return to the medication. *Id.* at 326.

A situational assessment report from Edwin Shaw Hospital dated January 24, 1995 indicates that Plaintiff has a lifetime learning disorder and her current level of employability was supported

employment, but she was not suited to even low level clerical work as she required work that was routine, repetitive, not speed dependent and was presented in a distraction-free environment as much as possible.  Tr. at 310.  The report also indicated that Plaintiff was not a candidate for further classroom training as her disability would present a frustrating hindrance for her and she would be better served with on-the-job-training.  *Id*.  Observations concerning Plaintiff included fluctuating punctuality, the fact that Plaintiff did not drive and could not use public transportation, she needed plain, straightforward instructions one to two steps in length with written reminders, she had difficulty maintaining a level of concentration for an extended period of time, decreasing ability to function with increasing stress levels, a slow pace, unacceptable numbers of errors, and difficulty with even simple organizational tasks.  *Id*. at 314-316.

School records dated June 29,1995 show that Plaintiff was exempted from high school achievement tests due to a handicapping condition specified in Ohio Rules.  Tr. at 216.  She completed an Individualized Educational Program during high school and was working at McDonald's, although she was easily distracted and needed to improve her social skills and get along with co-workers.  *Id*.

On October 10, 2008, Plaintiff was taken to Coleman Professional for evaluation by her mother and stepfather after she hit her husband, whom she was in the process of divorcing, and her parents were afraid she was going to harm her son.  Tr. at 329.  Plaintiff related that she discovered that her husband was having an affair with her friend and neighbor and she saw them kissing and she slapped her husband and admitted to hitting him before.  *Id*.  She noted that her husband was six feet tall and weighed three hundred pounds and she would have difficulty seriously hurting him.  *Id*.  Plaintiff explained that she was depressed, felt unloved and unwanted, felt like a failure because of

-10-

her husband's affair, she had poor sleep and appetite, and she was angry and upset and made statements about wanting to kill herself, but would never do so or hurt her son. *Id.*

Plaintiff related that she had worked at Taco Bell for the last 9 years and was also babysitting her friends' children in her home for the past two years. Tr. at 333. Licensed Social Worker ("LSW") Michelle Furbee diagnosed Plaintiff with acute adjustment disorder, with mixed disturbance of emotions and conduct and gave her a GAF of 60, indicative of moderate symptoms. *Id.* at 339.

On October 23, 2008, Plaintiff underwent a diagnostic assessment by Edith Todd, Ph.D at Coleman Professional, who agreed with LISW Furbee's diagnosis and recommended that Plaintiff undergo counseling with her two to four times per month and receive medication from her primary care physician. Tr. at 358-362. Dr. Todd noted that Plaintiff was experiencing anxiety and depression related to conflicts with her spouse and his decision to separate, seek joint custody of their chid and obtain a dissolution. *Id.* at 362.

On May 1, 2009, Dr. Duncan completed a form indicating that she first treated Plaintiff on October 31, 2008 and last saw her on December 15, 2008. Tr. at 342. Dr. Duncan's October 31, 2008 notes indicated that Plaintiff presented complaining of having shortness of breath and chest pains when she became upset since divorce proceedings began. *Id.* at 347. Dr. Duncan diagnosed chest pain and ordered an EKG, although she surmised that it was probably from her other diagnoses of depression and anxiety, for which she prescribed Plaintiff Paxil and Ativan. *Id.* Dr. Duncan's December 15, 2008 notes indicate that Plaintiff was still having chest pain, although her stress test results were normal. *Id.* at 348. She examined Plaintiff and found no abnormalities and diagnosed hypercholesterolemia, chest pain from stress, benign hypertension, and depressive disorder not elsewhere specified. *Id.* at 348-349. She changed Plaintiff's medications and refilled the Paxil. *Id.*

-11-

On May 12, 2009, Plaintiff underwent a diagnostic assessment at The Counseling Center of Wayne and Holmes Counties.  Tr. at 365.  Plaintiff reported difficulties in her marriage, with arguing and cheating, and indicated that she had been with five other men since September because it made her feel wanted and gave her control.  *Id.*  She reported feeling lonely, sad, stressed, quick to become angry, difficulty concentrating, impulsivity, and was in the process of getting a divorce.  *Id.* at 366-367.  Plaintiff reported that she last worked in 2006 and "chose to spend more time at home" with her son.  *Id.*  She indicated that she was outgoing and liked seeing her friends at the bar three to four times per week.  *Id.* at 367-368.  Her mental status showed that she was oriented, with an appropriate affect, normal mood, memory and thought content, below average intellect, and impaired concentration and judgment.  *Id.* at 371.  She was diagnosed with mood disorder, not otherwise specified and outpatient counseling and referral to a psychiatrist were recommended.  *Id.* at 372.

Records from the Counseling Center of Wayne & Holmes Counties dated June 30, 2009 through August 25, 2011 indicate that Plaintiff was transferred to Dr. Sampsel, Ph.D. of that agency due to insurance requirements.  Tr. at 566.  Dr. Sampsel first treated Plaintiff on August 11, 2009 and he noted that Plaintiff had a good appearance, good participation and good hygiene, and she had no problems with anxiety, agitation, depression, judgment, hallucinations or orientation.  *Id.* at 564.  Plaintiff noted a developing relationship with a man she had been dating for two months and she expressed feeling good about how she was handling her emotions, but she was frustrated about not having a job.  *Id.*

On April 7, 2010, Dr. Sampsel met with Plaintiff for counseling and he noted that she had a good appearance, good participation and good hygiene, and she had mild anxiety, no problem with agitation, mild depression, mild judgment, no hallucinations and no problems with orientation.  Tr.

at 561.  He noted that an update was necessary because she had not been in since August 11, 2009.
*Id*. at 533.  They discussed Plaintiff's poor decision-making and her looking for self-esteem through others.  *Id*. at 561.  Plaintiff requested a psychiatric referral so that she could continue her medications because they helped her "mood swings."  *Id*. at 533.  She also indicated that she did not have stable housing as she broke up with her boyfriend and moved in with a friend and her husband, but Plaintiff slept with her friend's husband and was kicked out of their home.  *Id.*

On April 12, 2010, Dr. Reddy met with Plaintiff for an initial psychiatric evaluation.  Tr. at 559-560.  It was noted that Plaintiff was hospitalized in Portage Path emergency services from March 18, 2010 to March 24, 2010 as she was threatening suicide.  *Id*. at 559.  Plaintiff explained that she had an affair with a friend's husband while she was staying with the friend and she was kicked out of the house and dropped off where her ex-boyfriend lived.  *Id.*  She became suicidal and called her father, who took her to Portage Path.  *Id.*  She was prescribed Lexapro and Lamictal and informed Dr. Reddy that she was doing much better with the medications.  *Id.*

Plaintiff indicated that she felt nervous and she needed to find a job or get on social security.  Tr. at 559.  She indicated that she had mood swings as every few days, she became depressed or felt good.  *Id.*  She also admitted to anger problems, explaining that the police were called every time she was kicked out of someone's home because she would become agitated and hit people.  *Id.*  She explained that every time she lived with a friend, she had an affair with her husband and this had happened three times.  *Id.*  She admitted promiscuity since being a teenager.  *Id.*  She stated that she began counseling in June of 2009 and then stopped.  *Id.*

Dr. Reddy diagnosed Plaintiff with bipolar disorder, depressed type.  Tr. at 560.  She found that Plaintiff was coherent and relevant, but anxious, she had no hallucinations, suicidal ideation or homicidal ideation, and her intelligence was below average.  *Id.*  She prescribed Plaintiff Lamictal and advised her to see her counselor regularly.  *Id.*

On April 18, 2010, Plaintiff presented to the emergency room complaining of depression and suicidal ideation.  Tr. at 410.  She related her bipolar disorder history and indicated that she had a fight with her roommates the day before and was hit in the face, although she did not lose consciousness.  *Id.*  She explained that she had added too much stress in her life and was thinking of hurting herself, although she did not have a specific plan.  *Id*.  Physical examination revealed a contusion to Plaintiff's lip and she was diagnosed with depression and suicidal ideation.  *Id*.  Portage Path Behavioral Health was called and the emergency room was awaiting disposition.  *Id.*

On May 6, 2010, Psychiatric Mental Health Nurse Practitioner Shumway signed discharge papers indicating that Professional Clinical Counselor Wingate had last saw Plaintiff on March 23, 2010 and found that her mood was euthymic, she had an appropriate affect, she was oriented, logical and coherent, with good eye contact and clear speech.  Tr. at 454.  Plaintiff had no suicidal or homicidal ideations and was now at a crisis stabilization unit.  *Id.*  Plaintiff told Ms. Wingate that her talk about wanting to jump off of a bridge was "just talk."  *Id.*

On May 10, 2010, Plaintiff met with Dr. Reddy for medication management and reported that she was doing very well except for financial problems.  Tr. at 557.  She was responding to the medication and noted no side effects.  *Id.*

On May 13, 2010, Plaintiff met with Dr. Sampsel, who noted that Plaintiff had good participation and good hygiene.  Tr. at 556.  They discussed her relationship with a man and his need to control her and her need to set firm limits and to leave if he was behaving inappropriately.  *Id*. Dr. Sampsel noted that Plaintiff seemed calmer.  *Id*.  Plaintiff reported that she was handling her anger better.  *Id*. at 532.

On June 28, 2010, Plaintiff met with Dr. Sampsel for counseling and with Dr. Reddy for medication management.  Tr. at 554-555.  She told Dr. Sampsel that her boyfriend was always trying to get money from her.  *Id.*  Dr. Sampsel found that Plaintiff was stable, with no suicidal ideation,

hallucinations or delusions and she was coherent, relevant, pleasant and cooperative. *Id*. at 555. She stated that she had been out of medications for eight days and was feeling edgy. *Id*. Dr. Reddy refilled Plaintiff's prescriptions after her counseling with Dr. Sampsel. *Id.*

On August 16, 2010, Dr. Sampsel noted that Plaintiff had only two counseling sessions in the past quarter. Tr. at 528. Plaintiff ran out of medication and was feeling edgy, "but otherwise seems to be doing fairly well." *Id.*

On September 20, 2010, Plaintiff treated with Dr. Sampsel and noted that she was moving to Stow to find a job. Tr. at 552. She stated that she would go to the mental health center in Stow and was still taking Lamictal and Lexapro. *Id.* Dr. Sampsel found that Plaintiff was coherent and relevant with no hallucinations or delusions. *Id*. He found that Plaintiff was doing well and was stable. *Id*.

On October 12, 2010, Plaintiff met with Dr. Sampsel for counseling and informed him that she was pregnant and afraid that the father was a one-night stand who was now avoiding her. Tr. at 551. She indicated that her boyfriend and his family were supportive and he would consider the child his own whether or not it was. *Id*. She was concerned that she was not able to take her medications while pregnant, but Dr. Sampsel noted that Plaintiff seemed to be doing well without her medications. *Id.* On November 24, 2010, Plaintiff treated with Dr. Sampsel and he noted that she had only had one counseling session in the past quarter. Tr. at 527. She informed him that she was pregnant and she was concerned about not being able to take her medications during pregnancy, but she reported that her obstetrician/gynecologist was letting her take the medications. *Id*.

On January 5, 2011, Plaintiff met with Dr. Sampsel and they discussed parenting issues as she was having a girl. Tr. at 549. Dr. Sampsel noted that Plaintiff was in good spirits. *Id*.

On February 28, 2011, Dr. Sampsel noted that Plaintiff had not received psychiatric services since September 20, 2010. Tr. at 526. Plaintiff indicated that she was still taking her medications and was pregnant. *Id*. She reported that she was doing "ok" managing her anger, but she was "hooking

up" with multiple men she met over the internet as she felt loved and wanted during sex. *Id*. She indicated that she had gotten several STDs and was very upset about it, but sex gave her a sense of control, although she felt worse afterward. *Id*.

On May 19, 2011, Dr. Sampsel noted that Plaintiff spent a lengthy period of time in the hospital due to high blood pressure during her pregnancy and was more irritable after having the baby as she had not been taking her Lamictal. Tr. at 525. They discussed the adjustments to having a baby in the house and Plaintiff indicated that she was pleased that she received so much support from her family and ex-boyfriend. *Id*. at 544. Plaintiff stated that she was more irritable due to fatigue, but otherwise she was doing fine. *Id*. She expressed concern because someone from the Children's Services Board called her and said that her baby was not gaining enough weight. *Id*. She feared that her baby would be taken away from her. *Id*. Dr. Sampsel found that Plaintiff seemed relaxed and very pleased, and was appropriately concerned about the baby gaining proper weight and developing well. *Id*. He indicated that Plaintiff seemed to be caring well for the baby. *Id*.

On July 12, 2011, Dr. Astreika, M.D. performed an initial psychiatric evaluation as Plaintiff presented for a medication check and to reestablish psychiatric care from Dr. Reddy. Tr. at 537. Plaintiff explained that she went off of her medications while she was pregnant, had given birth on April 12, 2011, and her gynecologist restarted her Lexapro and Lamictal. *Id*. Plaintiff reported feeling anxious and irritable mainly due to financial stressors and not knowing who the father of her child was. *Id.* Dr. Astreika's mental status examination indicated that Plaintiff's behavior was calm and she had good eye contact, she was oriented, had clear speech, fair concentration, fair memory, borderline intelligence, an anxious mood, full affect, no suicidal or homicidal ideations, logical thought process, and fair insight and judgment. *Id*. at 538-539. Dr. Astreika diagnosed bipolar disorder, depressed type, with a rule out diagnosis of impulse control disorder, and BIF as opposed to mild intellectual disability. *Id*. at 539. She rated Plaintiff's GAF as 50, indicative of serious

-16-

symptoms.  *Id.*  Dr. Astreika continued Plaintiff's Lexapro, increased the Lamictal, and considered IQ testing and case management.  *Id.*

On July 26, 2011, Dr. Dallara, Ph.D. performed a psychological evaluation of Plaintiff for the agency.  Tr. at 513.  He reviewed the May 12, 2009 diagnostic assessment from Wayne & Holmes County and interviewed Plaintiff.  *Id.*  Plaintiff reported that she could not work full-time because of her cerebral palsy and her inability to handle criticism.  *Id.*  She described her family history and said that she had fair grades in high school in the learning disability classroom and got along with teachers and students.  *Id.* at 513-514.  As to a legal history, Plaintiff reported a domestic violence charge and she stated that at the present time, she had no difficulty relating to others including neighbors or others in the community.  *Id.* at 514.

Plaintiff reported that she last worked at Taco Bell in 2008, but quit working there after two months because she wanted to spend more time at home.  Tr. at 514.  She worked at another Taco Bell from 1997 to 2007 and quit that job when she moved.  *Id.*  Plaintiff denied ever getting fired and did not describe a work history of difficulties completing her work, relating to others or coping with work demands.  *Id.*

Plaintiff indicated that she had been participating in outpatient mental health treatment at the Wooster Counseling Center for one year and also had treatment through Portage Path.  Tr. at 514.  Plaintiff described her daily routine as waking up between 4:00 a.m. and 5:00 a.m. and going back to bed until 9:00 a.m. or 10:00 a.m.  *Id.*  She then cared for her three year-old, watched television and did household chores.  *Id.*  She had dinner and went to bed around midnight.  *Id.*  She denied any hobbies, but stated that she cooked, cleaned and went shopping with a friend.  *Id.*

Dr. Dallara found that Plaintiff had appropriate eye contact, normal speech, logical but somewhat superficial thinking, no overt signs of anxiety, appropriate affect, no hallucinations, and she had a borderline range of intelligence.  Tr. at 515.  He diagnosed Plaintiff with bipolar disorder,

borderline intellectual functioning ("BIF") and indicated her GAF at 61, indicative of mild symptoms. *Id.* at 516. He opined that Plaintiff could understand, remember and execute instructions in a work setting consistent with BIF and her attention and concentration to perform simple tasks and to perform multi-step tasks, while perceived by her to reduce her effectiveness, would not objectively do so. *Id.* at 517. Dr. Dallara further opined that Plaintiff could respond appropriately to supervisors and co-workers as she made an unremarkable social presentation at the interview and there was no evidence to suggest inappropriate comportment during previous employment. *Id.* He lastly opined that although Plaintiff complained of problems handling criticism, she did not report a pattern of inability to adjust to workplace demands and she did not report a history of mental or emotional deterioration in response to work exposure. *Id.*

On August 4, 2011, Dr. Sampsel noted that Plaintiff had missed three scheduled appointments but at last contact, she reported that she felt anxious and irritable, but was improving her anger management and impulse control. Tr. at 521.

August 30, 2011 medication management notes from Dr. Astreika indicated that Plaintiff was feeling better since her last session. Tr. at 617. Plaintiff was calm, oriented, had good eye contact, clear speech, fair concentration and memory, full affect, logical thought processes, and fair insight and judgment. *Id.* Dr. Astreika found that Plaintiff was stable and improved. *Id.*

Notes from Dr. Astreika on December 1, 2011 show that Plaintiff appeared calm, made good eye contact, had normal speech, fair concentration and memory, full affect, logical thought processes and fair insight and judgment. Tr. at 616. She indicated that Plaintiff was stable but presented with irritability, and she rated her GAF at 50-60. *Id.* She increased Plaintiff's Lamictal. *Id.*

On January 11, 2012, Dr. Sampsel noted that he met with Plaintiff and she used the therapy session productively to discuss her concerns and she was receptive to his comments. Tr. at 614. He found her participation level good, her anxiety moderate, her depression mild, and she had no

problems with agitation, judgment, hallucinations or orientation.  *Id.*

On January 26, 2012, Dr. Astreika met with Plaintiff for medication management and noted that Plaintiff reported that she was compliant with her medications and experienced no side effects. Tr. at 613.  Dr. Astreika found Plaintiff to be calm, with good eye contact, oriented, had normal speech, fair concentration and memory, euthymic mood, full affect, logical thought process, and fair insight and judgment.  *Id.*  She noted that Plaintiff was stable and improved.  *Id.*  She rated Plaintiff's GAF at 60.  *Id.*

On February 28, 2012, Dr. Sampsel met with Plaintiff and her boyfriend and she indicated that she was pleased with her daughter's development.  Tr. at 612.  Dr. Sampsel noted that Plaintiff's participation was fair to good, she had no problems with anxiety, agitation, depression, judgment, orientation or with hallucinations.  *Id.*  He also commented that Plaintiff was receptive to feedback and her boyfriend seemed relaxed and friendly.  *Id.*

On April 3, 2012, Dr. Sampsel completed a mental impairment questionnaire indicating that he had treated Plaintiff since May of 2009 and her diagnosis was mood disorder, not otherwise specified, and her highest GAF of the year was 55, indicative of moderate symptoms.  Tr. at 605.  He checkmarked Plaintiff's symptoms as including appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, and decreasing energy.  *Id.* at 605-606.  As to the clinical findings demonstrating the severity of her mental impairment, Dr. Sampsel wrote that Plaintiff had difficulty managing her anger, could be impulsive at times,  had difficulty sleeping, and she often became "stressed out."  *Id.* at 606.   He noted that Plaintiff was on Lexapro and Lamictal and was participating in counseling.  *Id.* He identified a side effect of the medications as excessive sweating. *Id.* at 607.  His prognosis for Plaintiff was that she was "likely to have chronic problems," and he opined that her impairment would last or be expected to last more than twelve months and her psychiatric condition exacerbated her pain and other physical symptoms.  *Id.*   He also noted that

Plaintiff had reduced intellectual functioning based upon an evaluation conducted in late March. *Id*. He opined that Plaintiff would be absent from work more than three times per month due to her impairment and she would have difficulty sustaining full-time work because of her emotional instability, her inability to stand due to tendinitis and arthritis, her difficulties handling criticism, and her becoming easily angered. *Id*. at 608. He indicated that Plaintiff was moderately restricted in her daily living activities due to her mental impairment, markedly impaired in maintaining social functioning, and she had three or more episodes of decompensation. *Id*. at 609.

On March 29, 2012, Dr. Laurel Smith, Psy.D, for the Wayne County Department of Jobs and Family Services, performed a mental status examination and found that Plaintiff was self-conscious, withdrawn and tearful during the exam. Tr. at 637. She issued her examination findings and mental RFC assessment on May 1, 2012. *Id*. Dr. Smith noted that Plaintiff performed tasks with good motivation but was inefficient in her work as she tended to be plodding in her work, missed details, and needed frequent encouragement to complete tasks. *Id*. at 638. Her stress level was elevated and tense, anxious, insecure and subjectively depressed. *Id*. The results of testing noted that Plaintiff was depressed, had slowed thinking and had a pattern of dependency in that she had difficulty making everyday decisions without excessive reassurance. *Id*. It was also noted that Plaintiff was easily distracted and inconsistent and deficits were apparent in her immediate, recent and remote memory. *Id*.

Intellectual testing showed that she was in the borderline range, with a full-scale IQ of 69, which indicated mild mental retardation, and a verbal scale IQ of 68 indicative of mild mental retardation, and a performance scale IQ of 75 which indicated borderline intelligence. Tr. at 639. Dr. Smith considered these results a slight underestimate of capacity because of nonintellectual factor interference, such as anxiety. *Id*. Dr. Smith opined that Plaintiff would be capable of functioning within the extremely low range. *Id*. She also tested Plaintiff's academic functions which showed that

her basic academic skills were very low.  *Id.*  She diagnosed Plaintiff with dysthymic disorder, personality disorder not otherwise specified with dependent features, rule out mild mental retardation, and she rated her GAF at 45, indicating serious symptoms.  *Id.* at 640.  Dr. Smith recommended that Plaintiff receive psychological treatment, vocational rehabilitation, psychiatric evaluation, and opined that Plaintiff be considered "psychologically disabled."  *Id.*

Dr. Smith also completed a mental functional capacity form regarding Plaintiff.  Tr. at 635. She opined that Plaintiff was moderately limited in remembering locations and work-like procedures and in understanding, remembering and carrying out very short and simple instructions, performing activities within a schedule, maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, making simple work-related decisions, interacting appropriately with the general public, asking simple questions or requesting assistance, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places or using public transportation, and in setting realistic goals or working independently of others.  *Id.*  Dr. Smith also opined that Plaintiff was markedly limited in understanding, remembering and carrying out detailed instructions, maintaining concentration and attention for extended periods, working in coordination with others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers without distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior,  and adhering to basic standards of neatness and cleanliness.  *Id.*  She checked the boxes indicating that Plaintiff was unemployable and her limitations would last or be expected to last twelve months or more.  *Id.*

On May 10, 2012, Plaintiff presented to Dr. Sampsel for counseling and reported that things were generally going well and she was pleased that she had gotten a job.  Tr. at 667.  Her participation

was good, she had mild anxiety, and no problems with agitation, depression, judgment, hallucinations or orientation.  *Id*.

On May 16, 2012, Dr. Sampsel saw Plaintiff and discussed her problems with her anger and impulsive behavior.  Tr. at 659.

On July 9, 2012, Plaintiff presented to Dr. Sampsel for counseling and they discussed her medical issues concerning her heart and her hearing problems.  Tr. at 662.  He noted that Plaintiff was hopeful and optimistic about the future.  *Id*.  Her participation was good, and she had mild anxiety and depression, no agitation and no problems with orientation, judgment or hallucinations.  *Id*. at 663.

On August 14, 2012, Dr. Sampsel reported that Plaintiff saw Dr. Astreika on August 1, 2012 and had only one counseling session on the past quarter with him.  Tr. at 658.  Plaintiff had reported being very emotional with crying spells and sweating.  *Id*.

On November 14, 2012, Plaintiff presented to Dr. Astreika for medication management and told her about caring for a terminally ill friend, which made her stressed, anxious, and upset.  Tr. at 686.  Dr. Astreika noted that Plaintiff was calm and tearful, made good eye contact, had clear speech, good concentration and memory, borderline intelligence, full affect, no suicidal/homicidal ideations, logical thought processes, and fair insight and judgment.  *Id*.  She assessed that Plaintiff was stable and stressed and she prescribed Ativan for anxiety.  *Id*.

On December 3, 2012, Plaintiff treated with Dr. Sampsel and told him that she had a "breakdown" after she tried to briefly care for her terminally ill friend and realized that it was too much for her.  Tr. at 685.  Dr. Sampsel noted that Plaintiff seemed calm and stable and seemed to have recovered from the situation.  *Id*.

On February 6, 2013, Plaintiff presented to Dr. Astreika, who noted that Plaintiff was calm, made good eye contact, was oriented and had clear speech, had good concentration and memory, a full affect, no suicidal or homicidal ideations, logical thought processes and fair insight and judgment.

Tr. at 682.  She assessed that Plaintiff was stable and she diagnosed bipolar disorder, type II, with a rule out of impulse control disorder, BIF vs. mild intellectual disability, and she rated her GAF at 50-60.  *Id.*

### III.     SUMMARY OF TESTIMONIAL EVIDENCE

At the April 22, 2013 hearing held before the ALJ, Plaintiff testified and was represented by counsel.  Tr. at 49.  Plaintiff testified that she was thirty-eight years old and had a high school education, taking developmentally handicapped classes after trying for half a year to stay in regular classes.  *Id.* at 51-53.  She recently worked at Taco Bell but indicated that her most recent employment there only lasted a month and a half.  *Id.*  Her prior employment there lasted 11 years.  *Id*. at 51.

Plaintiff reported that she lived alone with her two year-old daughter after she and her boyfriend had broken up a year prior.  Tr. at 52.  She related that she has trouble reading and writing and twice attempted to get her driver's license, but did not do so.  *Id*. at 53-55.  She explained that she passed the written portion of the test but not the driving part.  *Id.* at 55.  She thought that it was due to mild cerebral palsy and she indicated that she got nervous the last time and hit the gas rather than the brake pedal.  *Id.* at 53-55.  She also noted some trouble performing more delicate hand motions, like handling a can opener or threading a needle.  *Id*. at 55.

Plaintiff reported that she tried to return to work twice since 2009, first at Goodwill Industries and then at Taco Bell.  Tr. at 56.  She reported difficulty standing at the job and difficulty getting along with people.  *Id.*  Plaintiff opined that she could not work full-time because she could not stand for a long period of time and because she gets very frustrated.  *Id*. at 57.  She explained that she got along with customers, but twice had problems with managers as she does not take criticism very well.  *Id*. at 58.  She reported that she could stand two to three hours before her legs and hips would give out and her legs would swell and her knees would hurt.  *Id.* at 61.  Plaintiff described a typical day

as caring for her two year-old daughter, cooking, doing the laundry and socializing with some family and friends. *Id*. at 63.

The VE then testified. Tr. at 65. The ALJ asked the VE to assume a hypothetical person with Plaintiff's age, education and background who could lift and carry, push and pull, up to 10 pounds frequently, 20 pounds occasionally, sit and stand/walk up to six hours of an eight-hour workday with a sit-stand option, with tasks requiring no reading or math requirements, no complex tasks, no work involving arbitration, mediation or negotiation, no telephone solicitation work, simple and repetitive work, no high production pace, and minimal contact with the public, co-workers and supervisors. *Id.* at 65-66. The VE testified that the hypothetical person could perform the jobs of a mail clerk, a laundry worker, and an office cleaner, all of which existed in significant numbers in the national, state and local economies. *Id.* at 66-67.

Plaintiff's counsel modified the ALJ's hypothetical, asking the VE to assume the same hypothetical person as the ALJ, except that lifting would be limited to less than ten pounds on a frequent and occasional basis, and standing and sitting was limited to less than two hours per day. Tr. at 68. The VE concluded that this constituted less than sedentary work. *Id.* at 68. Counsel modified the hypothetical person again, keeping the ALJ's limitations but also adding that the hypothetical person would miss work three times or more per month. *Id.* The VE concluded that no jobs would exist for such a hypothetical person. *Id*. Counsel then added marked limitations as outlined by Dr. Sampsel in his April 3, 2012 statement, and the VE testified that no jobs would be available for such a hypothetical person. *Id*. at 69.

## IV. **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to SSI. These steps are:

    1.    An individual who is working and engaging in substantial gainful activity will

not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R.  404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R.  404.1520(d) and 416.920(d)(1992));

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).   The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and RFC.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the ALJ's decision, even if substantial evidence exists

in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Id.; Walters,* 127 F.3d 525, 532 (6th Cir. 1997).  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

**VI.**     **ANALYSIS**

    **A.**     **Listing 12.05C**

Plaintiff first asserts that the ALJ failed to properly evaluate whether her condition met or equaled Listing 12.05C.  ECF Dkt. #13 at 16-19.  The undersigned recommends that the Court find that the ALJ properly applied the legal standards at Step Three and substantial evidence supports his determination that Plaintiff's mental impairment did not meet Listing 12.05C.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity.  20 C.F.R. § 416.920.  In the third step of the analysis to determine a claimant's entitlement to social security benefits, it is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment.  *Evans v. Sec'y of Health & Human Servs*., 820 F.2d 161, 164 (6th Cir. 1987).  In order to meet a listed impairment, the claimant must show that her impairment meets all of the requirements for a listed impairment.  *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987).  An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

An impairment or combination of impairments is considered medically equivalent to a listed impairment "* * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." *Land v. Sec'y of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir.1986)(per curiam). Generally, an ALJ should have a medical expert testify and give his opinion before determining medical equivalence. 20 C.F.R.§ 416.926(b). In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531.

The undersigned recommends that the Court find that the ALJ employed the proper standards in his Step Three analysis and substantial evidence supports his determination. The ALJ indicated that he considered all of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1 and the medical evidence concerning Plaintiff's impairments. He specifically considered Listing 12.05C, which is now entitled "Intellectual disability[1]" and states in relevant part:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function...;

Listing 12.05C. In order to satisfy this Listing, a claimant must first satisfy the diagnostic description of the introductory paragraph, and then satisfy any one of the four sets of criteria in Listing 12.05, that

---

[1] Effective September 3, 2013, the SSA replaced the term "mental retardation" with the term "intellectual disability" as a listed impairment. 78 Fed. Reg. 46, 499, 46, 4501 (Aug. 1, 2013)(to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1). This change in name "d[id] not affect the actual medical definition of the disorder or available programs or services." *Id.* at 49, 500.

is, part A, B, C, or D of the Listing.  Listing 12.00A.  "Intellectual disability," the diagnostic description of Listing 12.05, is defined as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).  Listing 12.05.  The claimant must then satisfy "any one of the four sets of criteria" in Listing 12.05, which in this case is paragraph C, which further requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  Listing 12.05C.

The undersigned admits that the ALJ's Step Three analysis concerning Listing 12.05C is brief. However, the ALJ specifically mentioned Listing 12.05C and concluded that Plaintiff does not have a valid, verbal, performance or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  *Id*. at 34.  He explained that Plaintiff's daily functioning does not support an IQ between 60 and 70 and he explained that he attributed little weight to Plaintiff's recent IQ testing because it was not consistent with her daily functioning and her 11 years of employment with Taco Bell.  *Id*. at 35.  He also noted that the testing was done for the purpose of obtaining social security benefits.  *Id.*  The ALJ further found that Plaintiff's activities were more supportive of BIF and not mild mental retardation.  *Id*. at 35.  He also noted that records from when Plaintiff was young indicated only mild intellectual difficulty and not mental retardation.  *Id*.

Plaintiff first argues that despite the ALJ's finding that "records from her youth" indicated that she had only "mild intellectual difficulty," she did have significantly subaverage intellectual functioning that occurred before age 22 as she was placed in special education classes in school and school records contained two sets of valid IQ scores which showed scores in 1986 of a verbal IQ of 82, a performance IQ of 74, a full scale IQ of 77 and scores in 1984 of a verbal IQ of 68, a

-28-

performance IQ of 77 and a full scale IQ of 71.

As pointed out by Defendant, however, the school IQ scores fall short of meeting Listing 12.05C as the first set of scores are not part of the record in this case but were merely referenced in a 1986 report.  ECF Dkt. #14 at 12, Tr. at 301.  Moreover, the November 1986 school IQ scores were above the threshold of 70 for Listing 12.05C as Plaintiff's verbal IQ was 82, her performance IQ was 74 and her full scale IQ was 77.  Tr. at 302.  Moreover, a doctor's note from 1994 when Plaintiff was 19 years old indicates that Plaintiff had only a mild intellectual difficulty and was taking Ritalin for attention deficit disorder.  *Id.* at 327.  Further, an evaluation by the Cuyahoga Falls City Schools in 1989 indicated that Plaintiff was functioning at the borderline below average range of cognitive ability.  *Id.* at 305.  These record facts support the ALJ's conclusion that Plaintiff did not meet the diagnostic description of Listing 12.05 as she did not show the onset of the intellectual disability before age 22.

However, even if the Court would find that Plaintiff's impairment did meet the onset requirement of Listing 12.05, the undersigned recommends that the Court find that substantial evidence supports the ALJ's finding  that Plaintiff's impairment did not meet the other requirements of Listing 12.05C.  Again, while brief, the ALJ found that Plaintiff's daily living activities failed to support an IQ of 60 through 70 as he attributed little weight to the most recent IQ scores from Dr. Smith's March 29, 2012 IQ testing of Plaintiff.  Tr. at 34-35.  Dr. Smith administered the WAIS-III and recorded Plaintiff's full scale IQ at 69 and verbal IQ at 68, which placed Plaintiff in the mild mental retardation range.  *Id.* at 639.  Plaintiff's performance scale IQ was 75, which is also in the borderline range of intellectual functioning.  *Id.*  As to these scores, Dr. Smith opined that "the test results are considered somewhat low as a measure of best current functioning and a slight underestimate of capacity because of interference from nonintellectual factors."  *Id.*  Dr. Smith opined that if Plaintiff could eliminate her anxiety, she would be functioning at the extremely low range of

intelligence rather than in the mental retardation range.  *Id*.  Thus, the ALJ properly attributed little weight to the actual test scores of Dr. Smith's IQ testing of Plaintiff because Dr. Smith herself estimated that despite the test scores, Plaintiff's basic intellectual abilities were within the borderline range.  *Id*.  In addition, as pointed out by the ALJ, Dr. Dallara, the agency psychological examiner, diagnosed Plaintiff with BIF.  *Id*. at 37.  The ALJ also relied upon Plaintiff's daily living activities and her past employment for eleven years at Taco Bell to support his finding that Plaintiff's impairment was more consistent with BIF as opposed to mild mental retardation.  *Id*. at 35.  Plaintiff told Dr. Dallara that she worked at Taco Bell from 1997 to 2007 but quit that job when she moved out of the area.  *Id*. at 514.  She also told him that she worked again at a different Taco Bell in 2008 but quit that job because she wanted to spend more time at home.  *Id*.  Plaintiff denied to Dr. Dallara that she was ever terminated from a job or had a history of not getting along with others on the job.  *Id*.  Plaintiff also reported that she cared for her minor daughter, and had passed the written portion of the driver's license examination.  *Id*. at 55.

Upon review of the ALJ's decision and the evidence cited by the ALJ, the undersigned recommends that the Court find that the ALJ properly applied the Listings and substantial evidence supports his decision to find that Plaintiff did not meeting Listing 12.05C.

### B.    Treating Psychologist Opinion

Plaintiff also asserts that the ALJ erred by failing to defer to the opinions of her treating psychologist, Dr. Sampsel.  ECF Dkt. #13 at 19-24.  She notes that Dr. Sampsel opined marked limitations for her and the ALJ failed to adequately articulate the controlling weight test and failed to sufficiently provide "good reasons" for rejecting his opinion.  *Id*.  As Plaintiff's treating psychologist in this case, Dr. Sampsel found that Plaintiff was markedly limited in maintaining social functioning, frequently experienced deficiencies in concentration, persistence or pace resulting in a failure to complete tasks in a timely manner, and had three more  repeated episodes of deterioration

or decompensation.  Tr. at 609.  He also opined that Plaintiff would be absent from work more than three times a month due to her emotional instability, trouble handling criticism, and her inability to stand due to tendonitis and arthritis.  *Id.* at 608.

The ALJ is responsible for resolving conflicts in the evidence and weighing the evidence, including medical source opinions.  *Perales*, 402 U.S. at 399.  An opinion on the nature and severity of a claimant's impairment is entitled to controlling weight, but only when: (1) the source giving the opinion is a "treating source" as defined in the regulations; (2) the opinion is well supported by medically-acceptable clinical and laboratory diagnostic techniques; and (3) the opinion is not inconsistent with other evidence.  20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r Social Security Admin.*, 378 F.3d 541, 544 (6th Cir. 2004).  The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001)(citations omitted).

An ALJ must evaluate the factors set forth in 20 C.F.R. §404.1527(d) in determining the weight to give to doctors' opinions.  20 C.F.R. §404.1527(d).  If the ALJ does not attribute controlling weight to the opinions of a treating source, he must examine the factors under 20 C.F.R. § 416.927(d)(2) in order to determine the weight to give to the opinion.  20 C.F.R. § 416.927(d)(2); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004).  These factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source.  *Id.*  Moreover, the ALJ must provide good reasons in his decision for rejecting a treating physician's opinion and must provide good reason for the weight that he chose to attribute to that opinion.  20 C.F.R. § 416.927(d)(2); *Pasco v. Comm'r of Soc. Sec*., No. 03-4358, 137 Fed.Appx. 828, 837, 2005 WL 1506343 at **7 (6th Cir. June 23, 2005), unpublished.

While the ALJ's analysis concerning Dr. Sampsel's opinion is also brief, the undersigned recommends that the Court find that the ALJ sufficiently applied the treating physician rule and substantial evidence supports the ALJ's decision to attribute little weight to Dr. Sampsel's statement. In *Gayheart* v. *Commissioner of Social Security*, the Sixth Circuit Court of Appeals emphasized that the social security regulations require that two separate analyses occur when evaluating a treating source's opinion. 710 F.3d 365, 375-377 (6th Cir. 2013).  The ALJ must first consider whether to give the treating source's opinion controlling weight by determining if it is well-supported by clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. *Id*.  Then, when the ALJ decides not to give controlling weight to the opinion, the ALJ moves on to determine the weight that the opinion should receive based on the regulatory factors. *Id*.

Courts in this District have reasoned that *Gayheart* did not present a new interpretation of the treating source doctrine, but rather reinforced the prior holdings of the Sixth Circuit.  *Aiello–Zak v. Comm'r of Soc. Sec.*, No. 5:13–CV–987, 2014 WL 4660397, at *4 (N.D.Ohio Sept.17, 2014) (citing *Rogers v. Comm'r*, 486 F.3d 234 (6th Cir.2007); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir.2009); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009)).  The Sixth Circuit has also held that if "the ALJ adequately addresses the factors required by *Gayheart* and articulates good reasons for discounting the opinion of a treating source, the Commissioner's decision will not be upset by a failure to strictly follow the *Gayheart* template." *Id.* at *5 (citing *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 427–28 (6th Cir.2014) ).  However, "the reasons must be supported by the evidence in the record and sufficiently specific to make clear the weight given to the opinion and the reasons for that weight." *Brasseur v. Comm'r of Soc. Sec.*, 525 F. App'x 349, 351 (6th Cir.2013) (citing *Gayheart*, 710 F.3d at 376).

Courts in this District have upheld ALJ determinations that did not comply with  *Gayheart.* The Court in *Phillips v. Commissioner of Social Security,* 972 F.Supp.2d 1001 (N.D. Ohio 2013)

faced an ALJ's brief analysis and nevertheless found that the treating physician rule was adequately met.  The treating source in *Phillips* completed a check box medical source statement concerning Phillips' limitations resulting from peripheral arterial disease.  972 F.Supp.2d at 1005.  The doctor had checked the relevant symptoms on the form that Phillips was experiencing and he opined standing, walking, sitting, lifting and leg elevation limitations for an eight-hour workday.  *Id*.  The ALJ stated that he attributed little weight to the statement because it was "conclusory and is not supported by the record."  *Id*. at 1006.  Phillips asserted that the ALJ's analysis did not meet the regulations or the Court's standard in *Gayheart.  Id.*

Despite the fact that the ALJ did not analyze the determination of controlling weight separately, the *Phillips* Court explained that the ALJ's finding that the opinion was conclusory and unsupported by the record,

> coupled with the ALJ's conclusion that "[t]here are no [office or treatment] records" (*id.*) to support certain claimed physical conditions, this is the functional equivalent of a determination by the ALJ that the treating physician's opinion (expressed in mere check marks on a form) need not be given controlling weight under the regulation because it was *not* "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and *was* "inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 416.927(c)(2). In other words, the opinion of Dr. Dhyanchand was so "patently deficient" that it could not be credited. *Cole,* 661 F.3d at 940; *see also Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001) (even though "medical opinions and diagnoses of treating physicians are entitled to great weight [,]" "the ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation' ") (quoting *King v. Heckler*, 742 F.2d 968, 973 (6th Cir.1984)). Further, although the ALJ's articulation of his reasons was very brief, it was clear and made specific reference to exhibits in the record by way of support. Finally, although plaintiff argues that the ALJ failed to make a controlling weight determination before he applied the factors of specialization of the source and length of the treatment relationship, this is not so, as revealed by a simple review of the ALJ's opinion: the declaration that Dr. Dhyanchand's opinion would be given little weight was made prior to the additional conclusions that he was not a specialist and had a short treatment relationship with plaintiff.

*Phillips*, 972 F.Supp.2d at 1007-1008.

In the instant case, the undersigned recommends that the ALJ's brief analysis explained his reasons for giving little weight to Dr. Sampsel's opinion, which was made prior to his reasons for doing so and he cited to one supporting exhibit in that part of his decision.  Plaintiff is correct that the ALJ should have provided more specific citations to the evidence upon which he was relying in this section of his decision.  However, earlier in his decision, the ALJ identified and reviewed some of Dr. Sampsel's treatment records and noted that Plaintiff's condition improved and stabilized when she was taking Lexapro and Lamictal.  *Id.* at 36, citing Tr. at 612, 679-688.  Dr. Sampsel issued his mental RFC statement on April 3, 2012 and his treatment records dated around that time indicate that he found that Plaintiff showed good participation and had none to only mild problems with anxiety, agitation, depression, judgment, hallucinations or orientation.  *Id.* at 611-612.  Dr. Sampsel's February 28, 2012 treatment note indicated that Plaintiff indicated that she was going well and she seemed receptive to feedback.  *Id.* at 612.  The January 26, 2012 psychiatric progress note by Dr. Astreika also indicated that Plaintiff's behavior was calm, she was oriented, had clear and normal speech, fair concentration and memory, borderline intelligence, logical thought process and fair insight and judgment.  *Id.* at 613.  Dr. Astreika noted that Plaintiff was stable and improved and was benefitting from medication management.  *Id.*  Dr. Sampsel's January 11, 2012 treatment note indicated that he found Plaintiff's participation level to be good, she had moderate anxiety, and had mild depression and no problems with agitation, judgment, hallucinations or orientation.  *I*d. at 614.  Dr. Sampsel noted that Plaintiff used the session productively to discuss her concerns and she was receptive.  *Id.*  Plaintiff presented to Dr. Astreika on January 1, 2012 as stable, but with irritability, and her Lamictal was increased.  *Id.* at 616.  Dr. Sampsel's February 28, 2011 treatment notes indicated that Plaintiff was doing well with her anger issues, and she had mild anxiety, moderate depression, mild judgment and no hallucinations or problems with orientation.  *Id.* at 622.  His January 5, 2011 notes indicated that Plaintiff was in good spirits and presented with good participation, mild anxiety, and no problems

with agitation, depression, judgment, hallucinations or orientation. *Id.* at 623.

In addition, the ALJ reasoned that Plaintiff's daily living activities failed to support the marked limitations as he had earlier noted her reports to counselors that she was living with a boyfriend and had lived with roommates before. Tr. at 36. Plaintiff had testified at the hearing that her boyfriend had been living with her but they broke up the previous year. *Id*. at 52. She also testified that she had a two year old daughter that lived with her that she took care of on her own and she had friends and family with whom she socialized. *Id*. at 63. He also relied upon the consultative examination of Dr. Dallara, who found on July 26, 2011 that Plaintiff would be able to understand and apply instructions in a work setting consistent with her BIF and she could maintain attention and concentration and could maintain persistence and pace to perform simple and multi-step tasks as she did not show easy distractability and reported no history of difficulties at work due to psychological issues. *Id*. at 517. Dr. Dallara also opined that despite Plaintiff's report that she was unable to handle criticism, he found no social presentation problems to him and he found no evidence to suggest improper comportment during previous employment. *Id*. He also found that Plaintiff reported no pattern of inability to adjust to workplace demands and a history of mental or emotional deterioration in response to work exposure. *Id.*

While the section of ALJ's decision analyzing Dr. Sampsel's medical source statement is brief and did not contain a separate discussion of the controlling weight analysis, a review of the rest of the ALJ's decision, coupled with that section, leads the undersigned to recommend that the Court find that he applied the proper standards of the treating physician rule and substantial evidence supports the little weight that the ALJ attributed to Dr. Sampsel's medical source statement. The ALJ properly found that Dr. Sampsel's treatment notes were inconsistent with his marked limitations for Plaintiff and those inconsistencies, along with Plaintiff's ability to work for eleven years at Taco Bell, to care for her minor child, to socialize with boyfriends, friends and family, and Dr. Dallara's findings of only

mild limitations for Plaintiff, constitutes substantial evidence to support the ALJ's determination.

For these reasons, the undersigned recommends that the Court find that the ALJ properly applied the treating physician rule and substantial evidence supports his decision to attribute little weight to Dr. Sampsel's medical source statement.

### C.    Examining Psychologist Opinion

Plaintiff also complains that the ALJ failed to adequately address the opinion of Dr. Smith, a one-time examining psychologist who examined Plaintiff and opined that she had marked limitations and was psychologically disabled from work.  ECF Dkt. #13 at 23.  Plaintiff asserts that the ALJ's only analysis of Dr. Smith's opinion was to find that it was inconsistent with Dr. Sampsel's treatment notes and he failed to address Dr. Smith's specialization, the examining relationship, the supportability of her opinion and the consistency of her opinion with her examination findings as required by Social Security Ruling ("SSR") 06-03p.  *Id*.

Dr. Smith examined Plaintiff on March 29, 2012 and found Plaintiff markedly limited in understanding, remembering and executing detailed instructions, maintaining attention and concentration for extended periods, working with others without being distracted by them, completing a normal workday or workweek without interruptions from psychologically based symptoms and performing at a consistent pace without unreasonable breaks, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers without distracting them or behaving in an extreme manner, and maintaining socially appropriate behavior.  Tr. at 635.  She recommended that Plaintiff received Vocational Rehabilitation, but she also opined that Plaintiff be considered "psychologically disabled" with regard to her work situation.  *Id*. at 640.

The ALJ must review and evaluate the opinions of one-time examining physicians and record-reviewing physicians because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians,

psychologists." 20 C.F.R. § 416.927 (e)(2).  When considering such opinions, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 416.927(e)(2)(ii). Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight. *Id*.  While an ALJ must consider the findings of agency medical and psychological consultants, he is not bound by their findings.20 C.F.R. § 416.927(e)(2)(i)).

The ALJ in the instant case identified Dr. Smith's opinion and noted that she had evaluated Plaintiff for the purposes of a disability assessment. Tr. at 37.  He indicated that Dr. Smith had opined moderate and marked limitations for Plaintiff.  *Id.* at 38.  He then gave little weight to both Dr. Smith and Dr. Sampsel's opinions, summarily explaining that the opinions were inconsistent with Dr. Sampsel's treatment notes, Plaintiff's daily activities, and Dr. Dallara's opinion.  *Id*.

In support of her assertion that the ALJ erred in his treatment of Dr. Smith's opinion, Plaintiff contends that Dr. Smith's statement was consistent with her examination findings, Dr. Sampsel's findings, Plaintiff's school age records and Dr. Smith's specialization in psychology.  ECF Dkt. #13 at 23.  However, this Court is limited to determining whether the ALJ applied the proper standard in attributing little weight to this statement and whether substantial evidence supports the ALJ's decision to attribute little weight to the statement.  The Court cannot reverse the decision of the ALJ, even if substantial evidence exists to the contrary, so long as substantial evidence supports the ALJ's determination.

Here, as pointed out by the ALJ, Dr. Smith provided a one-time examination for a disability assessment.  Tr. at 37-38, 636.  Dr. Smith's specialty is evidenced by the ALJ's use of "PsyD" after identifying Dr. Smith.  *Id.* at 37.  Moreover, the ALJ considered the consistency and supportability of Dr. Smith's opinion when he concluded that her limitations, like those of Dr. Sampsel, were not consistent with Dr. Sampsel's treatment records, which as outlined above, were explained earlier on in the ALJ's decision and showed Plaintiff's improvement with medication and for the most part essentially mild psychiatric and psychological examinations and findings.  *Id.* at 38, citing Tr. at 611-612, 680-685. In addition, the ALJ cited to Plaintiff's daily activities which included an 11 year work history with Taco Bell, her ability to care for her then two year-old child by herself, her ability to socialize with friends and family and to cook, do laundry and go shopping with a friend, and her statement to Dr. Dallara that she left her job because she wanted to spend more time at home.  *Id.* at 36-38, citing Tr. at 52, 62, 351, 513-514.  The ALJ also relied upon Dr. Dallara's examining psychological opinion which found no marked limitations but rather mild limitations.  *Id.* at 515-516. The undersigned recommends that the Court find that the ALJ applied the proper standards in assessing Dr. Smith's opinion and substantial evidence supports his reasons for attributing little weight to her opinion.

## VII.    RECOMMENDATION AND CONCLUSION

Based upon a review of the record, the Statements of Error and the law and analysis provided above, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS

Plaintiff's complaint in its entirety with prejudice.


Dated: December 18, 2015                           _____*/s/George J. Limbert*_____
                                                    GEORGE J. LIMBERT
                                                    U.S. MAGISTRATE JUDGE


        ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).